The next case is State of Florida v. United States of America. Joseph Darrow is here for the appellate. James Percival is here for the athlete, the State of Florida. Mr. Darrow, you may begin when you're ready. Good morning, Your Honors. May it please the Court, this Court should reverse the orders of the District Court vacating the Parole plus Alternatives to Detention Memorandum and adjoining the Parole with Conditions Memorandum. These memoranda represent the Department of Homeland Security's guidelines for using its parole authority under 8 U.S.C. 1182 D-5A in response to health and safety and border security risks that arise at the southwest border under conditions of overcrowding and peak encounter rates. Both of these memoranda were reasonable and reasonably explained and consistent with the parole statute. The District Court erred on a number of grounds, most notably in holding that these memoranda were contrary to law under the APA in violation of that parole statute. The District Court held that for three different reasons. First, the District Court held that the memoranda violated the clause in the parole statute that requires there to be an urgent humanitarian reason or significant public benefit justifying the parole. The District Court said that these memoranda violated that clause because they took into consideration DHS's operational circumstances. However, the statute does not preclude the Department of Homeland Security from considering the background factors. Just speaking for myself, I am a little more interested in whether or not Florida has standing to bring these claims. Are you not going to address that at all? I was, Your Honor. I'm going to add to that. So Florida lacks standing for a number of reasons. First, on the evidence that was submitted at trial, even before we get to the Supreme Court's subsequent decision in the United States v. Texas Enforcement Priorities case. But just on the evidence that was adduced at trial, the Lujan case instructs that an injury, in fact, has to be concrete and particularized. I'll say, I'll interrupt you because as someone who spent a good amount of time litigating against the federal government on similar issues to this on behalf of the state, I'm very sympathetic to your arguments, but I'm a little bit caught on the Texas decision and how we could see this as different than that. What gets you to a different answer than the state of Texas on whether this is an injury that's traditionally seen as judicially cognizable? One particular problem I have on that front is my concern that no matter what we as a court say or even the Supreme Court said, the federal government, I think it's understood, literally cannot follow all of these requirements to a T given budget constraints and all the rest of it. So what are we to do with that? A few pieces there. So first, to your point, we would argue that this case is not distinguishable from the Supreme Court's instructions in the enforcement priorities case. In order to demonstrate that an injury is legally cognizable, the litigant has to point to a history and tradition showing that this is a type of injury traditionally deemed cognizable and redressable by federal courts. And as the enforcement priorities case points out, this is extremely difficult to do when we're dealing with a state challenge to the use of Department of Homeland Security's enforcement discretion, as is the case here. And as the priorities case also pointed out, that when a state is raising only indirect financial injuries, not direct injuries, because here the memoranda at issue aren't acting directly on the state, they're acting on non-citizens and we don't get to an injury, an alleged injury to the state until those non-citizens move to Florida and start using state services and those state services incur a net cost to the state. Your argument is that the district court here did not have the benefit of the United States versus Texas when it entered its decision in this case and the United States versus Texas is pretty good authority for the proposition that Florida does not have standing, is that your argument? That's correct, Your Honor, because there's no legally cognizable injury because the indirect injuries that the court did identify are attenuated. And further, the court also found that the state was entitled to special solicitude and thereby lowered the bar to show traceability and redressability. And the enforcement priorities case also indicates that this doctrine, you know, to the extent that it has use in any state challenge, is not usable in this context of a state challenge to immigration enforcement based on these indirect injuries. What do we do with the footnote in the Supreme Court opinion suggesting that maybe it would look different for, I think, a case like this? I believe Your Honor's reference in the footnote about the continued detention of non-citizens who have already been arrested. I know this isn't exactly the same, but it feels pretty similar. What's your response to why that shouldn't guide our analysis here? Well, first of all, the Supreme Court did not say that that would necessarily present a different case. It just said that that might implicate different circumstances that would lead to a different analysis. But here, the analysis is not that different because we're not actually dealing with what the Department of Homeland Security views as detention of non-citizens. That's traditionally about detaining them while they're in removal proceedings or after they've been ordered removed. Here we're dealing with the very short-term holding of non-citizens by the Border Patrol for no more than three days while they're being processed. And that means issuing notices to appear or, you know, dispersed into the country or rejected for any number of other reasons. And here, if you read the District Court's opinion, one of the major issues is not so much with the detention or not, it's with the issuance of the notices to appear or not. That seems to be the primary concern. So here we're still dealing with the case of not taking enforcement action. Granted, it's not permanent non-enforcement action, right? The government intends to issue notices to appear to the individuals who are released under parole under these mechanisms. But it's a temporary decision not to take enforcement action, a deferment of that. And that temporary decision, even though temporary and not permanent, still involves many of the same discretionary determinations that a permanent decision not to enforce requires and should be evaluated similarly. So further on the issue of standing, regarding the evidence. The only specific injury that the Supreme Court, excuse me, that the District Court identified was an increase in the number of students being educated in four schools. But if you actually look at the nuances of that, that is, that determination is not traceable to the parole ATD policy. The only information that the State of Florida tracks is what it calls immigrant children and youth. And this category includes not only all non-citizens under any number of immigration classifications, but also United States citizens who are born abroad or who were not educated in the country within the past three years. Well, the District Court, or Florida says the District Court is entitled to draw inferences that of the 17,000 increase of non-citizens in Florida schools, it is more likely than not that they were paroled under this policy. Why isn't that enough to constitute an injury? Because of the posture of this case, Your Honor. Maybe an inference like that would be acceptable if this was a motion to dismiss for jurisdictional grounds. But we had a four-day trial in this case. We had extensive evidence produced concerning standing, several witnesses' testimony. And the case law has cleared that to establish standing at this posture in the proceedings, Florida needs to show a preponderance of the evidence. And an inference like that might suffice, you know, if we're giving reasonable, plausible inferences to a complaint. So your argument is that's speculative? Yes, Your Honor. Okay. That without anything more concrete saying that at least some portion of the 17,000 are eligible to the parole ATD program, we're just in the land of speculation. Was there any data to support that determination in the record in this case, that any of these non-citizens who came into Florida under this, or this increase in non-citizens in Florida is attributable to the Southwest border policy? Was there any evidence in the record? Not specifically to parole ATD. The, there was some evidence that it was attributable to individuals who were being released at the Southwest border under a variety of different policies and programs that were at issue at that time. But nothing that specifically said these individuals are releasees under the parole ATD program. In there any differences in the standing inquiry between this case and, say, the DACA or DAPA litigation that's gone on in other circuits? Yes, Your Honor. So, and if you look at, and actually there's a good explanation in the subsequent Fifth Circuit case, the Texas versus United States case over the migrant protection protocols, where the court says we can draw inferences when there is big picture evidence of an increase in state costs due to individuals present in the state. In both the DACA and DAPA and MPP cases, there was evidence that, okay, we have a certain number and it's particularly relevant to DACA and DAPA. We know that there are so many hundreds of thousands of, or tens of thousands of individuals who are present in the state who are undocumented immigrants. There the court had to then infer, okay, that this is likely going to drive up costs in some way to the state. But here we don't even have that first piece of evidence. All we know was that there was an increase in immigrant children and youth. We don't even know that there's, you know, an extra 10,000 people in Florida, for instance, due to parole ATD. We don't, that number is still a question mark. So this is, this case requires two levels of inference, whereas those cases just require one level. And we would ask that if this court doesn't reverse the standing holding outright, at least it would remand to the district court to determine whether Florida's evidence still satisfies the Article III standard in light of the priorities case and especially the priorities case's indication that indirect financial injuries like this are attenuated, suggesting that there must be some higher evidentiary bar for establishing those than would be normal. Unless there are other questions on standing, I'll go back to the merits. So the district court's main issue with the violation of the Urgent Humanitarian Reason Clause was that, was the number of non-citizens who were paroled under these memoranda. But the statute does not say that groups cannot share Urgent Humanitarian Reasons for significant public benefit. And the language significant public benefit itself seems to implicate a broader public than just an individual whose benefit is being considered. Holding otherwise would contravene decades of practice by the Department of Homeland Security that's been actively ratified by Congress, who routinely passes bills that provide benefits and paths to lawful status for groups of non-citizens who've been paroled in sharing a common justification for parole, including Ukrainians, Afghani nationals, Polish and Hungarian nationals. You're saying that Congress has in some way implicitly affirmed the policies that are going on right now regarding immigration? I find that a tough contention. It's spoken specifically on the parole ATD and parole with conditions policies, but it has through offering benefits to other groups that have been paroled. So, for instance, the U4U, the Uniting for Ukrainian program offers parole to Ukrainian individuals who are largely fleeing the war. And the Congress has, you know, in bills. Can we take the lack of such programs for other categories of immigrants to suggest that Congress does not does not want to provide special benefits for those groups? I think it'd be hard to infer anything from a negative, Your Honor, especially because these programs are so recent that Congress may just not have had the opportunity to act on them yet. I see. I see my time is up. Thank you. All right. Thank you, Mr. Dell. Mr. Percival for the state. Thank you, Your Honor. And may it please the court, James Percival for the state of Florida. I'd like to, if I may, just pick up with Judge Grant's questions because I think her questions about United States v. Texas touch on sort of two distinct important issues. One is Judge Kavanaugh's majority opinion and the other is Justice Kavanaugh and the other is Justice Gorsuch's concurrence. And starting with the majority, I just want to be clear. The court discussed, well, before I get to that, that opinion very much rests on this initiation of enforcement proceedings area. And the court is, I think, I think there's an Article II overlay to the court's decision and the court says over and over again that it's only talking about the initiation of enforcement proceedings. And I do want to. But why shouldn't the reasoning in the Texas case apply to this case? Well, because the court expressly says that it's not reaching that question and to Judge Grant's question earlier, it's not a footnote. But why would we apply a different reasoning to this case? Well, because the court went out of its way above the line to go through five scenarios that it was not addressing. And when the court tells us that it's not addressing something, then I think we should go to the pre-existing case law that exists. So we should use different reasoning? Well, the court's reasoning is very much grounded in the specific decision to initiate an enforcement proceeding and the separation of powers that exist with that decision. The court specifically says that it's not addressing an arrest and then release. It also says it's not addressing the conferral of affirmative benefits. And the two cases it cites are the Wade and Mexico MPP case and the DACA and DAPA cases. And actually what's going on in those cases is perfectly analogous to what's going on here. So if you look at the conferral of affirmative benefits, if you go read Regents, what the court says is what's going on in that case is DHS is giving these aliens something called deferred action. And the way deferred action works is there's a pre-existing DHS regulation that says when you get deferred action, you get work authorization. That is the same regulation we are relying on here. So the grant of parole here has the exact same features that the court relied on in Regents. Well, weren't there other provisions of DACA, you know, various special, I'm blanking out now, but there was more than just putting people into pre-existing statutory buckets, whereas here it seems like that's more what's going on. So actually, I think that's the other way, Your Honor, because deferred action is more grounded in this sort of unwritten idea of enforcement discretion, whereas parole is an express affirmative benefit that's laid out in the statute and that there's an express statutory standard for. So I actually think parole is a greater benefit than deferred action. And then in the MPP case, the whole premise of that case was that there were releases on parole going on. That was exactly what the court discussed. So I think this is on all fours with what was going on in MPP. Now, I recognize that the court did not discuss standing in the MPP decision, but the court sort of elevated it to a standing case when it cited it in United States v. Texas as an exception to the court's reasoning. So I think because United States v. Texas expressly carves out these two scenarios, then we have to go back to the drawing board and look at what the case law said before United States v. Texas. And there are two cases in particular I would point the court to. The first is Department of Commerce v. New York. And I want to remind the court what the standing theory was in Department of Commerce v. New York. The theory was, well, if we include this question on the census, some noncitizens or aliens might not respond. And if aliens don't respond, there might be an undercount. And if there's an undercount, New York might get less grant funding. And so there's sort of several steps in the analysis. This is a downstream economic effect of federal regulation. And there was a trial in that case. New York put on evidence not of what was going to happen, but what had happened in the past. And the court said that looks good to us. So I think that precedent, which the court did not overrule, more clearly applies here. And then the other case I would point the court to is Childs v. Thornburg. In Childs v. Thornburg, the court held that a state entity had standing because it deployed resources in response to federal immigration policies, and particularly their management of a detention facility in Florida. Childs v. Thornburg is on all fours here. And under this court's precedent, it is bound to apply it because the Supreme Court has not overruled Childs v. Thornburg. With that, I would like to go to the Justice Gorsuch concurrence, because I think that's what your question was saying. That's right. I mean, what I'll give you, I know you all have things to say, but I'll give you one background concern I have, is this, it's pretty clear that there's an obvious problem here. But I think Justice Gorsuch's concurrence goes to the point that, is this a political problem or a problem of a legal violation? Well, let me tell you a few reasons why I think Justice Gorsuch's concurrence  I think what's driving Justice Gorsuch's concurrence is that when they, in terms of priorities, know what the agency was doing, they can still do. And that's what Justice Gorsuch says. And here we know that's not true, both as a matter of law and as a matter of fact. So as a matter of fact, we know that's not true because we have the data. And what we see is, these memos go into effect, and you see 100,000 paroles per month. The memos get vacated or rescinded, and you see five paroles per month. So we know as a matter of fact that that's not true. We also know, though, as a matter of law, that that's not true, and that is because of the way 8 CFR 212.5 is written. So historically, when DHS does these mass paroles, which we think are unlawful, but they've been doing for a long time, they ground these paroles in a provision of 212.5 that authorizes DHS to parole aliens when detention is no longer in the public interest. The problem for DHS is that this regulation does not apply to this category of aliens. And the reasons for that are somewhat detailed, but that's on page 40 of the brief.  So Florida's argument, as I understand it from the brief, is that there are more students in Florida schools that they have to educate, and there are increased costs, and that's attributable to this policy. Where's the data to reflect that? It's sufficient to support that you've got an injury that's more than just speculative. Does the record reflect how many new students in the Florida schools are attributable to the Southwest border policy? Not precisely, but let me tell you what the evidence does show, because I think the evidence is actually very good. And I just have to respectfully disagree with Mr. Darrow about what the data says. It's cited in footnote 5 of our brief. So what we got from DHS was we got, it's a little more than a one-year snapshot, but given when parole plus ATD was in effect, it's essentially a one-year snapshot. And what they did is they broke down the releases by policy, or at least by mechanism of release, but the parole releases were under this policy. And then they told us how many of those people they understood to be in Florida. So the number of parole plus ATD aliens released was 80,000 in Florida during that one-year period. So it's 80,000 aliens in Florida, and then we heard testimonial evidence from an education official about the influx in schools. We heard evidence about the fact that these individuals are required to send their children to school, and they do so. We also heard evidence about the fact that these policies were, especially for parole plus ATD, was disproportionately a family unit policy. And then we have data from the schools that show a 17,000 increase in immigrant children and youth. And while immigrant children and youth don't necessarily mean these individuals. How many of those 17,000 are attributable to the Southwest border policy? We don't have that exact piece of information. You don't know. You don't know, right? Well, we think the district court quite rightly made an inference from all of the information that at least some of the- In order to have standing, don't you need a little more than conjecture and speculation? Well, it's not- And we don't have the data. The court says it's more likely than not. Don't you need a little bit more than that to have a concrete, particularized injury sufficient to support standing? We do need a concrete, particularized injury, Robert, but the burden of proof for the necessary facts for standing are the same as for every other fact. And I don't think it was unreasonable for a fact finder, based on all of that evidence, about 80,000 new aliens in the state released under this policy- We have to guess that they're students in schools, non-citizen students in schools, who are attributable to the Southwest policy. I don't think it's a guess, Robert. I think if the same facts were presented on an element that was not a standing element, I think any judge would send this to the jury. And prepondence of the evidence is the same for standing. I would point the court in particular to Blackwater Riverkeeper, this court's decision, which makes this exact point. Now, the facts there were slightly different. It was about pollution, but the defendant argued, you have to show that these precise chemicals that are being released are showing up in the exact place that's causing the injury. And the court specifically noted that that is not what is required to prove traceability, and that that would be an unduly high burden for the plaintiff to demonstrate that. So I think Blackwater Riverkeeper just forecloses that conclusion based on the mountain of evidence that supports the court's inference. Another one of the concerns that I have about your argument in this case is that when we read recent Supreme Court opinions, the Supreme Court isn't particularly enamorated with this special solicitude for states when dealing with matters involving executive discretion. In fact, Justice Gorsuch says we need to leave special solicitude on the shelf. What do you have to say about that? So I think it is fair to say that there are some justices on the Supreme Court who have thrown shade at special solicitude, for lack of a better term. I would make two points, Your Honor. Yeah, the weight of authority seems to be that it's inappropriate when you deal with the executive's use of discretion in immigration matters. Yeah, Your Honor, so just to go back to those points, I guess the most important point I would make to Your Honor, given that that's where you are, is that if you look at the district court's decision when it talks about the Blackwater Riverkeeper case, Blackwater Riverkeeper is not a special solicitude case. And if you remember that what special solicitude gets you in particular is relaxed traceability and redressability, the Court said when it discussed Blackwater Riverkeeper that it would find those two elements met even without special solicitude. So I don't think there's any remand necessary even if the Court thinks special solicitude does not apply because the Court made an express finding under this Court's precedent that we don't need special solicitude, or at least you can infer that the Court didn't think we needed it because special solicitude goes to those two elements. I do want to go back to redressability because there's one more response to Judge Grant's question because I think part of Your Honor's question is, well, aren't they just going to find another way to release these aliens? And that is true. That is what's going on now. They're releasing them under a different mechanism, but there's a very important reason why we still have redressability in this case. So the distinction between the policies that have been vacated and enjoined and what the government is doing now is that now they are initiating removal proceedings and then releasing the aliens, whereas before they were releasing the aliens and then going and finding them and initiating removal proceedings. And if you look at the administrative record, there is a five-year backlog at least, and the record says it's going to keep getting longer. And that backlog is not an immigration court's backlog. That is a backlog to start the removal proceedings process. That is a backlog to initiate the notice to appear. So if you think about what's going on now, now they're issuing the notice to appear at the border and then releasing them. And what the district court said is, well, at a minimum, we have partial redressability because issuing the notice to appear at the border as opposed to five years down the road reduces the total amount of time that these aliens are in the state causing the state expenditures. Do you know if these NTAs are—this isn't necessarily relevant, but I'm curious. Do you know if these NTAs are sufficient according to what the Supreme Court has said they need to contain in terms of the date and all of the other things? My understanding—this is not on the record, Your Honor, but I'll just answer your question. My understanding is they do have a court date. Now, so, I mean, just play this out. Let's say it takes five to ten years to get through immigration court. Well, if you're released under parole plus ATD, it's five to ten years plus however long the backlog is. And the administrative record tells us it's— I think the district court found that it was five years at least. So if you just think about the expenditures we're incurring, there's just five more years of the expenditures if they keep doing this. And they have apparently figured out how to issue the NTAs at the border and release aliens. So while Your Honor is right that they do not have the resources to detain everybody, what we've learned since these orders went into effect is they have figured out a way to issue the NTAs, and that partially addresses Florida's injury. I think there's just one more point I want to make because my time is pretty limited. I explained to Your Honors why 212.5 does not authorize these paroles, and that's why these memos are distinct from a lot of these other scenarios. But I think what makes this case even more egregious is that in 2022, the government did notice and comment rulemaking. I'm trying to find the page. I think it's on page 31 of their brief or somewhere near there. There's a Federal Register site. So the government in 2022 did notice and comment rulemaking. It did it with the express purpose of expanding the scope of its parole authority to apply it to different categories of aliens. So they have this detention is no longer in the public interest parole regulation, and they went out of their way to do notice and comment rulemaking to expand the category of eligible aliens. In that rulemaking, the agency did not choose to apply it to the category of aliens at issue here. So what we have in this case is an off-the-books regulation by secret memorandum where the agency is using secret memos to obtain what it traditionally does through notice and comment rulemaking. Well, agencies have to conduct notice and comment before passing legislative rules. That's what the United States Code says. But these are just general statements of policies. These parole policies are not legislative rules. Well, I would respectfully disagree, Your Honor, and I think DHS disagrees as well because they chose to do notice and comment rulemaking a mere two years ago to amend this regulation to expand its application. I think that they got caught with their hand in the cookie jar in this case when we filed a lawsuit based on a news report, and they were forced to produce the memorandum. And with that, Your Honor, I'm out of time, and we would just ask the Court to affirm. Thank you. All right. Thank you, Mr. Darrow. Mr. Percival, you reserve some time for rebuttal. Yes, Your Honor, thank you. Just to address counsel's last point first, I believe the notice and comment process that he was referring to was the government's what we call dishonor officer rule, which dramatically changed the way that people who were going through the expedited removal process would receive credible fears. You know, it was changing the agency that was conducting those. It was a very significant change to the expedited removal edifice, and it affected individual rights. So it would have been a legislative rule, unlike the guidance at issue here, which are not themselves binding on anyone. They leave the border patrol agents the discretion to grant parole or deny parole as they see fit and as appropriate, and they do not dictate any binding outcome for any party. To step back to some of counsel's arguments about standing, first of all, I would note that the district court did not specifically find that there were any specific number of non-citizens present in Florida due to parole ATD explicitly. Florida had brought an overall challenge to what it called the non-detention policy, which swept in all of the Department of Homeland Security's release policies going on at the southwest border at that time, and the district court found that there were 100,000 non-citizens present in Florida from that omnibus non-detention policy, including parole ATD. But to my knowledge, it didn't specifically say the X number of non-citizens in Florida due to parole ATD. Is it even plausible, though, that the number there would be zero? I mean, don't we have to consider reality a little bit? I don't see why we could think the number would be anything less than one. I think it's plausible to assume that there were some non-citizens due to parole. No, I'm saying is it plausible to assume that there were not any, right? Does our decision have to reflect an assumption that's not even plausible? No. I think the court can assume that there were some non-citizens present in Florida due to parole ATD, but that's just the first piece that has to fall into place to its understanding. Then it has to have evidence that not only were they present, but they were using state services. And then not only were they using state services, but that use of state services resulted in a net cost to the state. But didn't you have evidence that was presented before the district court judge from education officials about the non-citizen students who had now come to the classrooms? Yes, Your Honor, concerning the requirement for English learning. I mean, there wasn't, I understand there wasn't a specific number, but there certainly was testimony that non-citizen students had become enrolled in public schools. The education witness said that I believe he had spoken to some families and that they had been, you know, released at the Southwest Board. He might have even said parole, but again, there are many, many programs and many different initiatives utilizing parole, and that information was not, you know, concretized to a particular time period where we can necessarily. How many of the new students in the Florida public schools, non-citizen students were attributable to the Southwest Board of Policy? We don't have that information. We have 17,000 new non-immigrant, excuse me, new immigrant children and youth during the time period in which the policy is being challenged or in operation. But then it requires us to speculate what number, 17,000, and remember that the 17,000 also includes United States citizens who were born abroad. Well, let me ask you this as a hypothetical question because I understand it's not in the record, but I'm just curious. If the State had provided and had been able to ascertain the number of students that had been paroled at the Southwest border and now were attending public schools and were causing the State to incur costs, would they have standing? If they were to establish that a certain number of students were in their schools directly due to the parole ATD policy and that resulted in a net increase in costs to that agency, yes. But we don't have several pieces of that. What if it was five students? I don't think the number is what matters. It's the ability to establish that any number of students were part of these policies and that they raised the costs. And if you can establish that, then you have standing. But we don't have that evidence here. It seems like you're disclaiming in that case that this is similar to United States versus Texas, right? If you're saying that the point is that they can't show how many students are or if any students are there causing Florida more costs, then that's why they don't have standing. But it sounds like you're not making the argument about an injury that's typically considered judicially cognizable. Are you shifting away from that argument? No, no, no. We're thinking both in the alternative. So first there's the evidentiary argument, and then that's what we view as more of the legally cognizable argument, that this isn't the type of injury that has traditionally been deemed legally cognizable, that Florida and the district court can't point to any precedent showing where a third party has been able to sue over the government's allegedly overbroad use of parole and obtain relief on that basis. But you're saying that if they showed that there was an increased cost to the state as a result of the policy, then they would have standing? No. As an evidentiary matter, yes. But they would still have to satisfy the other bars to standing that the priorities case demonstrated, which include that the injury is legally cognizable to begin with. Would it matter how much the costs were? I don't think so, Your Honor. I think they just have to establish that there is a net increase in costs. Thank you for realizing that the statement I was referencing by Justice Kavanaugh was not in a footnote. I'm glad that you could figure out what I was talking about. I'd like you to respond to opposing counsel's argument that the government's change in timing of issuing the NTA doesn't provide partial redressability to the extent that we're concerned about redressability in this case. Why doesn't that give Florida at least some relief for their asserted injury? Well, that's not the relief that the district court ordered. It vacated and then enjoined us from using the parole under these two memoranda. But, you know, relatively speaking, the government can look at this and see that any use of parole in these circumstances is going to be viewed as a violation of the court's order at this point. And so, as counsel noted, it's been using other mechanisms. I don't think you're suggesting that there's other methods of violation of the district court's order though, right? No, no, they're not. But it's also not the redress that the court provided. And we believe that the redress that the court provided was dramatically overbroad because it prevents us from using parole in these contexts for all citizens going to all states in the country. But Florida only, you know, at best, alleged injuries due to one state, not the other 49. But it has prevented the administration from using this particular approach, right? Parole with alternative detention and parole with conditions, yes. Right, okay. All right, I think we have the argument, counsel. Thank you. Thank you.